ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL IX

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>KEVIN XAVIER MARTY CRUZ<br><br>Apelante | KLAN202400768 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Caso Núm.: ISCR202400329 ISCR202400330 ISCR202400331<br><br>Sobre: Art. 3.3 Ley 54 (2 cargos) y Art. 6.06 Ley de Armas |
|---|---|---|

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Marrero Guerrero y el Juez Campos Pérez

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 8 de agosto de 2025.

Comparece la parte apelante, el Sr. Kevin X. Marty Cruz, quien impugna las *Sentencias* emitidas en su contra el 23 de julio de 2024, por el Tribunal de Primera Instancia, Sala de Mayagüez (TPI). Por virtud de los referidos pronunciamientos, el apelante fue condenado a cumplir un total de seis (6) años de prisión, luego de que fuera juzgado por un Tribunal de Derecho y encontrado culpable mediante los respectivos fallos dictados el 13 de junio de 2024.

**I.**

El 20 de marzo de 2024, el Ministerio Público presentó **tres (3) acusaciones** en contra del señor Marty Cruz,[1] por hechos criminales acontecidos el 19 y 21 de febrero de 2024, en Mayagüez.[2]

EL REFERIDO ACUSADO KEVIN XAVIER MARTY CRUZ ALLÁ EN O PARA EL DÍA **19 DE FEBRERO DE 2024** Y EN MAYAGÜEZ, PUERTO RICO, QUE FORMA PARTE

---

[1] Véase, Autos ISCR202400329, pág. 31; Autos ISCR202400330, pág. 111; Autos ISCR202400331, pág. 151.

[2] El 22 de febrero de 2024, el TPI encontró causa probable para arresto contra el señor Marty Cruz y fijó una fianza global de $300,000 que no pudo prestar, por lo que fue sumariado. El 7 de marzo de 2024 se celebró la vista preliminar. Véase, Autos ISCR202400329, págs. 1 y 21-22; Autos ISCR202400330, págs. 103-105; Autos ISCR202400331, págs. 131-133.

Número Identificador

SEN2025_____

DE LA JURISDICCIÓN DEL TRIBUNAL DE PRIMERA INSTANCIA, SALA DE MAYAGÜEZ...

**ISCR202400329**

... ILEGAL, VOLUNTARIA, Y CRIMINALMENTE AMENAZÓ A LA SRA. FRANSHESKA BELL PADUA GUZMÁN, QUIEN ES SU EX-COMPAÑERA CONSENSUAL, PERSONA CON QUIEN COHABITÓ Y SOSTUVO UNA RELACIÓN CONSENSUAL, CON CAUSARLE DAÑO A SU PERSONA. CONSISTENTE EN QUE EL ACUSADO SE PRESENTÓ EN EL APARTAMENTO DE LA PERJUDICADA, LE MOSTRÓ UNA CUCHILLA ACERCÁNDOSELA AL CUELLO Y LE INDICÓ QUE CON ESO MISMO LA IBA A MATAR. SINTIENDO ÉSTA TEMOR POR SU VIDA Y SU SEGURIDAD.

**ISCR202400331**

... ILEGAL, VOLUNTARIA, MALICIOSA, CON CONOCIMIENTO, A PROPÓSITO, A SABIENDAS Y CON INTENCIÓN CRIMINAL, SACÓ, USO, MOSTRÓ PARA FINES DE OFENSA Y NO DE DEFENSA UNA CUCHILLA PEQUEÑA, PLATEADA, QUE ES UN INSTRUMENTO CORTANTE, ARMA BLANCA Y MORTÍFERA, CON LA CUAL PUEDE CAUSARSE GRAVE DAÑO CORPORAL O HASTA LA MUERTE A UNA PERSONA Y LO UTILIZÓ EN LA COMISIÓN DEL DELITO DE ART. 3.3 LEY 54 CONTRA LA SRA. FRANSHESKA BELL PADUA GUZMÁN.

**ISCR202400330**

EL REFERIDO ACUSADO KEVIN XAVIER MARTY CRUZ ALLÁ EN O PARA EL DÍA **21 DE FEBRERO DE 2024** Y EN MAYAGÜEZ, PUERTO RICO, QUE FORMA PARTE DE LA JUNSDICCIÓN DEL TRIBUNAL DE PRIMERA INSTANCIA, SALA DE MAYAGÜEZ, ILEGAL, VOLUNTARIA Y CRIMINALMENTE AMENAZÓ A LA SRA. FRANSHESKA BELL PADUA GUZMÁN, QUIEN ES SU EX-COMPAÑERA CONSENSUAL, PERSONA CON QUIEN COHABITÓ Y SOSTUVO UNA RELACIÓN CONSENSUAL, CON CAUSARLE DAÑO A SU PERSONA. CONSISTENTE EN QUE EL ACUSADO SE PRESENTÓ EN EL APARTAMENTO DE LA PERJUDICADA LA EMPUJÓ HACIA LA CAMA Y ANTES DE IRSE LE INDICÓ QUE SI LA VEÍA CON ALGUIEN LA IBA A MATAR A ELLA Y CON QUIEN ELLA ESTUVIERA. SINTIENDO ÉSTA TEMOR POR SU VIDA Y SU SEGURIDAD.

La lectura de acusación se celebró el 21 de marzo de 2024, ocasión en que el apelante dio por leída la trilogía de pliegos acusatorios y solicitó el término reglamentario para registrar su alegación.[3] Posteriormente, el 1 de abril de 2024, se registró su **alegación de no culpable.**[4]

---

[3] Véase, Autos ISCR202400329, pág. 33.
[4] Véase, Autos ISCR202400329, pág. 47.

Luego de varias incidencias procesales, inmeritorias de particularizar, el 13 de junio de 2024, comenzó el **juicio en su fondo**. En esa ocasión, el señor Marty Cruz, asistido por la debida representación legal, **renunció al juicio por jurado**. El TPI examinó bajo juramento al apelante y determinó que la renuncia fue libre, voluntaria e inteligente, por lo que dispuso la continuación de los procedimientos por el **Tribunal de Derecho**.[5]

Durante la vista en sus méritos, el Ministerio Público ofreció y se admitió como Exhibit 1 el documento intitulado *Advertencias Miranda para persona sospechosa en custodia*, suscrito por el apelante el 21 de febrero de 2024.[6] En apoyo a las acusaciones, el Ministerio Público presentó los siguientes testigos: la Agte. Marilyn Álvarez Rodríguez y la señora Fransheska B. Padua Guzmán.[7]

Examinamos, a continuación, los testimonios que desfilaron en el juicio en su fondo:

### Agte. Marilyn Álvarez Rodríguez

Las partes estipularon la capacidad de la agente Álvarez Rodríguez, quien labora en la División de Violencia de Género y fungió como investigadora del presente caso.[8]

Para el 21 de febrero de 2024, la testigo atendió la querella realizada por la señora Padua Guzmán, cuyo sospechoso era el apelante, a quien identificó en el tribunal.[9] A tales efectos, entrevistó a la querellante y narró los hechos de 19 y 21 de febrero de 2024, según ésta le indicó. En esencia, relató que el señor Marty Cruz penetró en la residencia de la señora Padua Guzmán, quien lo descubrió detrás de la puerta de la habitación de la hija de ella. Él

---

[5] Véase, Autos ISCR202400329, págs. 70-73. Transcripción de la Prueba Oral (TPO), págs. 3-7.
[6] Véase, Autos ISCR202400329, pág. 71 (sobre).
[7] El Ministerio Público solicitó una enmienda al pliego acusatorio, a los efectos de suprimir el testimonio del Agte. William Lugo Sepúlveda. Véase, Autos ISCR202400329, pág. 73.
[8] TPO, págs. 8 líneas 25-29; 9 líneas 1-8.
[9] TPO, pág. 9 líneas 9-26.

le preguntó que con quién ella hablaba y trató de quitarle el móvil. Ella guardó el aparato en su bolsillo para evitar que él lo tomara, ya que en una ocasión anterior éste le rompió otro teléfono. Dijo que la señora Padua Guzmán le pidió al apelante que se fuera.

> R. Cuando él se va a ir, le indica [ ] que, si la ve hablando, si la ve con alguien o la veía hablando o estaba ella con alguien, que la iba a matar a ella y que iba a matar a la persona con quien ella podía estar y que se marcha de la casa.[10]

La testigo afirmó que la señora Padua Guzmán le narró que ese incidente no fue el único. Dos días antes, el 19 de febrero de 2024, alegó que el señor Marty Cruz también penetró en la residencia sin autorización y la querellante le cuestionó cómo entró y qué hacía allí.[11]

> R. Que él se levanta la camisa, saca una cuchilla y le dice con esto. Le pregunto más o menos qué tamaño, ella dice que no era muy grande,[12] que se la pone en el cuello y dice con esto es que yo te voy a matar y que ella le indica que se vaya también de la casa. Le pregunto, verdad, que si ella se lo indicó a alguien. Ella me indica que en las dos ocasiones ella se había comunicado con el señor Orlando que es el padre de Kevin y que le había notificado lo que estaba sucediendo.[13]

Aseveró que, después de este incidente, la señora Padua Guzmán no llamó a las autoridades.[14]

En su turno de preguntas, la Defensa cuestionó a la testigo sobre una veintena de mensajes que la señora Padua Guzmán, presuntamente, generó al móvil del señor Marty Cruz el 20 de febrero de 2024, pero la funcionaria del orden público lo desconocía.[15] Tampoco conocía que el día 21 el señor Marty Cruz, supuestamente, le dijo a la querellante que iba a denunciar a su esposo por un asunto migratorio.[16]

---

[10] TPO, págs. 10; 11 líneas 1-18.
[11] TPO, págs. 11 líneas 19-30; 12 líneas 1-6.
[12] Según la testigo, la perjudicada describió la cuchilla como pequeña. TPO, pág. 21 líneas 9-14.
[13] TPO, pág. 12 líneas 6-12.
[14] TPO, pág. 19 líneas 6-9.
[15] TPO, pág. 19 líneas 2-5.
[16] TPO, pág. 22 líneas 9-14. La señora Padua Guzmán verificó afirmativamente la advertencia contra su esposo. TPO, pág. 43 líneas 14-17.

De otro lado, la agente Álvarez Rodríguez atestiguó que, luego de realizar las advertencias de ley y el apelante suscribirlas (Exhibit 1, sin reparo de la Defensa), entrevistó al señor Marty Cruz en la Comandancia el 21 de febrero de 2024.[17] Declaró que el apelante le dijo lo siguiente:

> R. Pues **él me indica que tenía una relación aproximadamente de un año a dos años, que ellos habían terminado la relación para septiembre**, que en verano, no recuerdo bien, en julio, ella se había ido para los Estados Unidos, que estaban también separados porque él había estado en vicio. Se le preguntó, ¿verdad? **Él indica que él había estado allí, que ella no sabía, pero que sí había estado allí.**
>
> **P. ¿Que él había estado allí dónde?**
>
> **R. En la residencia de ella.**
>
> **P. ¿Cuándo?**
>
> **R. Ese día.**
>
> **P. ¿El 21 de febrero?**
>
> **R. Sí, que la había empujado, que ella en el área de la sala le iba a dar con un jarrón**, eso fue prácticamente lo que él me había indicado.[18] (Énfasis nuestro).

Al día siguiente, se presentaron los tres cargos contra el apelante.[19]

En el contrainterrogatorio, la agente Álvarez Rodríguez asintió al cuestionársele si "el orden cronológico de sus notas es que él estaba en la sala, ella le iba a dar con un jarrón, entonces el joven le manifiesta que la había empujado".[20] A su vez, reconoció que el apelante sabía que la señora Padua Guzmán estaba casada. Además que, a pesar de que la relación culminó en septiembre, ambos continuaron comunicándose y comportándose como pareja y sostuvieron relaciones sexuales. "Sí, en ocasiones estaban juntos".[21]

---

[17] TPO, págs. 13 líneas 6-29; 14 líneas 1-8.
[18] TPO, pág. 14 líneas 11-23.
[19] TPO, pág. 15 líneas 1-15.
[20] TPO, pág. 24 líneas 24-26.
[21] TPO, págs. 16 líneas 8-29; 17.

***Francheska Padua Guzmán***

La testigo de treinta años es cuidadora de envejecientes.[22] Luego de identificar al señor Marty Cruz,[23] indicó que lo conocía porque fue su pareja durante un año y medio, hasta septiembre de 2023.[24] Aceptó, no obstante, que culminada la relación, "[n]os llamábamos, enviábamos mensajes de texto y nos veíamos, algunas veces [...] [e]n su casa".[25] Ahora, luego de la separación el apelante no tenía permitido ir a la casa de la querellante, ya que así lo había establecido.[26]

> P. Le pregunto en relación a Kevin que si algo sucedió el lunes 19 de febrero del año 2024, que provoque que estemos aquí.
>
> R. Sí.
>
> P. ¿Dónde usted estaba ese día? El **19 de febrero**.
>
> **R. En mi casa**.
>
> P. ¿Dónde usted vive, Francheska?
>
> R. En Río Cristal.
>
> P. Ok. ¿Y qué si algo sucedió durante ese día?
>
> R. Pues ese día yo estaba de camino para mi casa como a las 6:30 de la mañana y lo veo a él como saliendo de Río Cristal, entonces no fue hasta más tarde ese día, mi nena estaba en la sala, yo estaba lavando ropa.
>
> P. Más tarde, ¿cómo qué hora era eso que usted me dice que su nena estaba en la sala?
>
> R. Aproximadamente como de 12:30 a 1:00 de la tarde.
>
> P. Ok. Continúe. Usted me indica que ese día usted lo vio temprano en la mañana y más tarde usted se encontraba en su casa que su hija estaba en la sala y qué más y dónde usted estaba.
>
> R. Yo estaba en la primera planta lavando ropa y estaba mi nena en la sala sentada en el sillón.
>
> P. Ok, ¿y qué sucedió mientras su hija estaba en la sala?
>
> R. Yo subí para la segunda planta, donde están los cuartos, están las habitaciones y está el baño, entonces mi teléfono estaba abajo y comenzó a sonar, mi nena me dice que el teléfono estaba sonando. Me dice que ella piensa que era Kevin porque las llamadas eran insistente, bajo a coger el teléfono y le digo que suba.

---

[22] TPO, pág. 25 líneas 13-17.
[23] TPO, pág. 25 líneas 20-26.
[24] TPO, págs. 25 líneas 27-30; 26 líneas 1-4.
[25] TPO, págs. 26 líneas 8-11.
[26] TPO, pág. 32 líneas 17-24.

P. ¿A quién usted le dice que suba?

R. A mi nena. Ella me dijo que la perra estaba oliendo insistentemente por debajo de la puerta.

P. ¿Qué puerta?

**R. De la puerta principal, de la entrada. Entonces subió y yo vuelvo bajo a atender la ropa y entonces me doblo como para mirar por debajo de la puerta y vi una sombra, subo a decirle a mi nena que todo estaba bien que se quede tranquila, entonces cuando bajo Kevin estaba en la sala.**

**P. Ok. ¿Y qué usted hace cuando se encuentra a Kevin en la sala de su casa?**

**R. Pues me asusté, estaba bien asustada, empecé a reclamarle cómo había entrado, qué por qué había entrado, porque la puerta estaba cerrada con seguro y se alzó la camisa de este lado y me enseñó una cuchilla y me dijo con esto.**

P. Que conste para récord ha indicado este lado y se está tocando en el área de la cintura en el área derecha. Continúe. ¿De dónde se saca lo que usted me está indicando?

R. El área del pantalón del lado derecho.

**P. Ok. ¿Qué sacó de ahí?**

**R. Una cuchilla.**

**P. ¿Cómo era esa cuchilla?**

**R. Era pequeña porque cabía dentro de su mano.**

P. ¿Qué pudo usted observar en la mano de Kevin?

R. Pues lo que vi fue la parte de arriba, como, no el puñal sino la parte de arriba como de la cuchilla que era como así, plateada.

P. ¿Cuándo usted se refiere que no vio el puñal?

R. En la parte de abajo de la cuchilla. Como la parte de abajo.

P. ¿La parte donde se agarra? Y eso usted no lo veía.

R. No.

P. ¿Y qué es lo que usted logró ver?

R. Como tal lo que corta la parte de arriba de la cuchilla.

P. ¿Tan pronto Kevin saca esa cuchilla que usted indica qué sucedió si algo que usted hizo?

R. Pues me eché para atrás y me preguntó con quién yo estaba. Yo dije que estaba con mi nena y me eché para atrás en la misma sala y **empecé a decirle que se fuera porque ya habían ocurrido demasiadas cosas y yo tenía mucho miedo, estaba asustada y se me acercó por aquí y me dijo que con esto mismo es que te voy a matar**.

**P. Cuando usted dice se me acercó y pone la mano aquí en su cuello ¿qué usted se refiere que hizo**

**Kevin exactamente? ¿Qué tenía Kevin en la mano si algo cuando se le acercó al cuello?**

**R. La cuchilla. La misma que me enseñó cuando me dijo que con eso había abierto la puerta**.

**P. ¿Y qué le dijo en esos momentos?**

**R. Que con eso mismo era que me iba a matar.**

**P. ¿Qué usted hizo tan pronto él le indica eso?**

**R. Yo le empecé a decir que se fuera insistentemente que se fuera porque yo tenía mucho miedo**. Al darse la vuelta en la misma sala en el escritorio **yo tenía la cartera y se le dio como una apuñalada con la cuchilla y se fue**.

**P. ¿A dónde dio una apuñalada?**

**R. En la cartera, en esta cartera**.[27]

[...]

P. Luego de eso ¿qué sucedió y si algo Francheska?

R. Se fue.

P. Y que usted hizo ante ese evento ese día.

R. Por la tarde llamo a su papá.

P. ¿Al papá de quién?

R. De Kevin.

P. ¿Con qué propósito usted llamó al papá de Kevin?

R. Para decirle lo que estaba pasando y como para que a ver si de alguna forma él le podía hablar y como pedirle a su papá como que se detuviera, no hiciera nada, como que ya un consejo.[28] (Énfasis nuestro).

La declarante atestiguó que no llamó a la policía, pues pensó que fue suficiente con el aviso dado al padre del apelante.[29]

P. Posterior a ese día qué si algo sucedió con Kevin, ¿verdad? ¿Que provoque que estemos aquí también?

P. El **21 de febrero** yo salí de trabajar como a las 7:00 de la mañana, llegué a casa como a las 7:30, 7 y pico, entonces yo estoy en la recta para entrar para el clúster y veo el carro, que es su carro, el Kia, estacionado detrás de una guagua alta, entonces yo lo vi, pero yo dentro de mí dije bueno, como el carro tenía un gravamen, lo estaban buscando y encima estaba sin tablilla y yo dije, pues, lo dejó ahí para que no lo consiguieran o algo así. Entonces me estacioné, yo vivo en un segundo piso.

P. ¿A qué distancia estaba el vehículo de Kevin de su apartamento? Más o menos.

R. Como decirte de la puerta...

---

[27] La testigo no llevó a la Policía la referida cartera; véase, TPO, pág. 38 líneas 13-19.
[28] TPO, págs. 26 líneas 12-29; 27-28; 29 líneas 1-11.
[29] TPO, págs. 29 líneas 12-16.

P. ¿Estaba en el estacionamiento del edificio donde usted vive?

R. No, estaba afuera.

[...]

P. ¿Una vez usted observa ese vehículo qué usted decide hacer?

R. Entro y me estaciono.

P. ¿En dónde?

R. En el estacionamiento correspondiente a mi apartamento. **Entonces subo a mi casa, ya la puerta estaba abierta sin seguro** porque mi nena me había llamado a decirme que se iba para la escuela que si cerraba la puerta, le había dicho que no porque ya yo estaba entrando literalmente por la gallera y estaba cerca y le dije que no la cerrara. Entonces entro, estoy subiendo y me da un olor a perfume, nada, lo ignoro porque en [el] área hay hombres, entonces subo a las escaleras del segundo piso y el olor se me hace mucho más fuerte, entonces me estaban dando, a raíz de toda esta situación, me estaban dando ataques de ansiedad y entonces ahí yo me detengo, respiro hondo y yo digo, wao, otra vez lo mismo, la misma situación porque ya **había sido varias ocasiones que el caballero había entrado sin permiso, sin autorización**. Entonces me dirijo al baño porque usualmente la puerta del baño siempre está abierta, entonces estaba cerrada, chequeo, había un fuerte olor a *listerine* y yo dije, aquí tiene que haber alguien porque mi hija no se enjuaga la boca con *listerine*, entonces **procedo a entrar al cuarto de la nena a chequear, buscando a ver dónde estaba porque para mí él estaba allí y estaba en el cuarto de la nena detrás de la puerta, escondido**.

**P. ¿Quién estaba detrás de la puerta?**

**R. Kevin.**

P. ¿Y qué usted hizo cuando usted se dio cuenta que Kevin estaba detrás de esa puerta?

**R. Pues me asusté y le empecé a decir que se fuera**, que se fuera, que se fuera y en eso yo tenía mi teléfono en la mano y **me pregunta con quién yo hablaba, yo le dije que con nadie, entonces me eché el teléfono en el bolsillo del *scrub* del trabajo y lo aguanté porque anteriormente ya él me había roto un celular**, entonces para que no ocurriera lo mismo yo lo cogí y me lo eché en el bolsillo, entonces ahí empecé a decirle que se fuera, que se fuera, que se fuera y que me dejara tranquila, que ya estaba harta de la situación, que ya estaba cansada, que mentalmente no estaba bien, entonces **me empujó de esta parte de por aquí hacia la cama**, entonces ahí como que la puerta estaba media junta la abrió y me dijo te tengo una sorpresa, le digo a mí no me gustan las sorpresas mucho menos de ti. Cuando comenzó a bajar las escaleras del segundo piso del apartamento **me dijo no te preocupes que con quien yo te vea te voy a matar a ti y a esa persona**.

De ahí yo caminé hasta la puerta de arriba más adelante del cuarto y ahí él se fue.[30] (Énfasis nuestro).

La señora Padua Guzmán manifestó que tomó un calmante y se acostó. Luego de llamar a la Comandancia para orientación, se dirigió al lugar. Antes, llamó al padre del señor Marty Cruz para alertarlo del incidente.[31]

A preguntas de la Defensa, la señora Padua Guzmán admitió que estaba legalmente casada mientras duró la relación con el señor Marty Cruz; así como que continuaron viéndose y comunicándose después de finalizada la relación.[32] De hecho, hubo comunicación entre el 19 y el 21 de febrero de 2024; incluyendo la veintena de mensajes cursados el día 20. En éstos, aludió a la mala higiene del apelante y otras cualidades negativas.[33] Por igual, le expresó que la dejara tranquila, que se encontraba emocional y mentalmente destruida.[34]

Se le cuestionó y admitió que, a pesar de estar temerosa, no tomó medidas de protección;[35] como pedir ayuda antes de adentrarse a la residencia a buscarlo.[36] No obstante, reiteró que temía al señor Marty Cruz.[37] Añadió que dejó de compartir con el apelante porque la perseguía, se le aparecía en todos lados, la llamaba muchas veces, le rompió un teléfono, le explotó una goma y la amenazó con quemarle el apartamento y "[e]staba en vicio".[38]

Ponderada la totalidad de la prueba vertida, el 13 de junio de 2024, el TPI emitió sendos **fallos de culpabilidad** contra el señor Marty Cruz por los **tres (3) cargos imputados**.[39] En consecuencia,

---

[30] TPO, págs. 29 líneas 17-30; 30 líneas 5-29; 31 líneas 1-15.
[31] TPO, pág. 31 líneas 17-30.
[32] TPO págs. 33 líneas 24-29; 34.
[33] TPO, págs. 36 líneas 5-13; 45 líneas 1-11.
[34] TPO, pág. 46 líneas 14-21.
[35] TPO, pág. 37 líneas 9-17.
[36] TPO, pág. 41 líneas 2-8.
[37] TPO, pág. 45 líneas 12-14.
[38] TPO, págs. 45 líneas 25-30; 46 líneas 22-26.
[39] Véase, Autos ISCR202400329, pág. 73.

el 23 de julio de 2024, el TPI lo condenó a extinguir las siguientes

**sentencias carcelarias**:[40]

| Art. 3.3 Ley 54 ISCR202400329 | Tres (3) años | Concurrente |
|---|---|---|
| Art. 3.3 Ley 54 ISCR202400330 | Tres (3) años | Concurrente |
| Art. 6.06 Ley de Armas ISCR202400331 | Tres (3) años | Consecutivo |

El TPI impuso, además, el pago de la pena especial estatuida

en los Artículos 48(i) y 61 del Código Penal de Puerto Rico, 33 LPRA

secs. 5081(i) y 5094; así como la Ley Núm. 34 de 27 de agosto de

2021, *Ley para la imposición de la pena especial del Código Penal de*

*Puerto Rico*, 4 LPRA sec. 1661 *et seq*. Para su cumplimiento,

concedió un plazo de noventa (90) días.

Inconforme con el resultado en su contra, el 13 de agosto de

2024, el señor Marty Cruz presentó una *Apelación* ante nos. Señaló

la comisión de los siguientes errores:[41]

> ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD POR INFRACCIÓN A LOS ARTÍCULOS 3.3 DE LA LEY 54-1989 Y ARTÍCULO 6.06 LEY 168-2019 A PESAR DE QUE LA PRUEBA PRESENTADA FUE UNA CONTRADICTORIA, INVEROSÍMIL Y SIN CORROBORACIÓN ALGUNA.

> ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD, TODA VEZ QUE LA PRUEBA DEL MINISTERIO PÚBLICO NO DERROTÓ LA PRESUNCIÓN DE INOCENCIA Y NO ESTABLECIÓ LOS ELEMENTOS DE LOS DELITOS MÁS ALLÁ DE DUDA RAZONABLE.

Atendidos los trámites de rigor, el 9 de junio de 2025, el señor

Marty Cruz instó el *Alegato Suplementario de la Parte Apelante*. El

Pueblo de Puerto Rico, por conducto de la Oficina del Procurador

General, presentó *Alegato de El Pueblo de Puerto Rico* el 7 de julio de

---

[40] Véase, Autos ISCR202400329, pág. 90; Autos ISCR202400330, pág. 128; Autos ISCR202400331, pág. 156.

[41] Transcribimos los errores planteados en el *Alegato Suplementario de la Parte Apelante*, distintos a los de la *Apelación*, ya que el señor Marty Cruz no renunció a presentar errores adicionales de Derecho, tras la debida evaluación del expediente y la totalidad de la prueba oral desfilada durante el juicio en su fondo, citando a *Henderson v. US*, 133 S Ct. 1121; 2013 y *Pueblo v. Soto Ríos*, 95 DPR 483 (1967).

2025. Con el beneficio de ambas comparecencias, los Autos Originales y la Transcripción de la Prueba Oral de Oficio (TPO), estamos en disposición de resolver las controversias planteadas.

**II.**

**A.**

**(i)**

La Constitución de Puerto Rico establece como derecho fundamental que a toda persona acusada de delito le cobija la presunción de inocencia. Art. II, Sec. 11, Const. PR, LPRA Tomo 1. Por consiguiente, para emitir un fallo de culpabilidad, el Ministerio Público tiene la carga probatoria para demostrar, más allá de duda razonable, todos los elementos del delito y su conexión con la persona acusada. *Pueblo v. Toro Martínez*, 200 DPR 834; 856 (2018); *Pueblo v. García Colón I*, 182 DPR 129, 174 (2011); *Pueblo v. Santiago et al.*, 176 DPR 133, 143 (2009). Claro, lo anterior no equivale a que se tenga que probar la culpabilidad del acusado con certeza matemática. *Pueblo v. Toro Martínez, supra*, pág. 856; *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 71 (1991). **Para determinar que la prueba controvierte la presunción de inocencia, se exige prueba satisfactoria y suficiente en Derecho**. *Pueblo v. Toro Martínez, supra*, pág. 856; *Pueblo v. García Colón I, supra*, págs. 174-175. Es decir, la norma de suficiencia de la prueba, según la Regla 110 de Procedimiento Criminal,[42] conlleva que se absuelva al acusado si existe duda razonable luego de un estudio de la totalidad de la evidencia. La prueba que justifique una convicción tiene que ser satisfactoria, de modo que "produzca la certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". *Pueblo v. Acevedo Estrada*, 150 DPR 84, 100 (2000). Esto significa que, si la prueba admitida por el acusador produce

---

[42] 34 LPRA Ap. II, R. 110.

insatisfacción en el ánimo del juzgador, entonces, existe duda razonable y fundada. *Pueblo v. Cabán Torres*, 117 DPR 645, 652 (1986). En atención a este principio, **los foros apelativos debemos tener la misma satisfacción y tranquilidad al evaluar la prueba en su totalidad**. *Pueblo v. Casillas, Torres*, 190 DPR 398, 415 (2014); *Pueblo v. Colón Burgos*, 140 DPR 564, 581 (1996).

Como se sabe, la presunción de inocencia asiste al acusado hasta el fallo de culpabilidad. **En los remedios postsentencia, la carga de persuadir al tribunal recae en el acusado**. E.L. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Adjudicativa*, San Juan, Ediciones Situm, 2018, Sec. 4.3, pág. 154. "Recordemos que con el fallo de culpabilidad —mediante el cual se entenderán probados los delitos imputados más allá de duda razonable— acaba la presunción de inocencia y nace la presunción de corrección del dictamen". *Pueblo v. Arlequín Vélez*, 204 DPR 117, 149 (2020). Esto es así, porque **la apreciación imparcial de la prueba que hagan los juzgadores de hechos merece respeto y confiabilidad**. *Pueblo v. Rosario Cintrón*, 102 DPR 82, 83 (1974).

Además, las determinaciones de hechos probados que hizo el juzgador primario no se deben descartar arbitrariamente, a menos que, de la prueba admitida, surja que no existe base suficiente para apoyarlas. *Pueblo v. Acevedo Estrada*, *supra*, pág. 99. A tales efectos, sólo cederá la deferencia en etapa apelativa si: (1) hubo prejuicio, parcialidad o pasión, o (2) la prueba no concuerda con la realidad fáctica, es increíble o imposible. *Pueblo v. De Jesús Mercado*, 188 DPR 467, 481 (2013). A estos fines, queda claro que la determinación de si se probó la culpabilidad del acusado más allá de duda razonable es un asunto de Hecho y Derecho, revisable en apelación. *Pueblo v. Torres Medina*, 211 DPR 950, 959 (2023); *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002); *Pueblo v. Rivero, Lugo y Almodóvar*, 121 DPR 454, 472 (1988).

**(ii)**

De otro lado, se conoce que nuestro esquema probatorio está revestido de deferencia a las determinaciones que hacen los juzgadores de primera instancia en cuanto a la prueba testifical, ya que ese foro está en mejor posición para aquilatarla. *Pueblo v. De Jesús Mercado, supra*, págs. 477-478. Así ha opinado nuestro alto foro:

> Como regla general, **un tribunal apelativo no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el juzgador de los hechos, ni tiene facultad para sustituir las determinaciones del foro primario por sus propias apreciaciones**. Este Tribunal ha reafirmado que las determinaciones de hechos del Tribunal de Primera Instancia a las que sustente prueba oral merecen gran deferencia de los tribunales apelativos. Ese axioma está basado en consideraciones lógicas, ya que el magistrado del foro primario es quien ha tenido la oportunidad de contactar directamente ese tipo de prueba. *Id.*, pág. 478. (Citas suprimidas y énfasis nuestro).

Al respecto, el Tribunal Supremo ha acotado que es "[e]l juez sentenciador, ante quien deponen los testigos, quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad". *Pueblo v. García Colón I, supra*, pág. 165. Es de esta manera, porque

> [t]ambién hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y, sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación. *Ortiz v. Cruz Pabón*, 103 DPR 939, 947 (1975).

Por ende, cuando convergen asuntos de suficiencia de la prueba y deferencia en cuanto a la apreciación de la prueba

testifical, como foro apelativo, nos corresponde examinar si la determinación de credibilidad del foro de instancia rebasó los límites de la sana discreción judicial. Véase, *Pueblo v. De Jesús Mercado*, *supra*, pág. 484.

**B.**

La Ley Núm. 54 de 15 de agosto de 1989, *Ley para la Prevención e Intervención con la Violencia Doméstica*, 8 LPRA sec. 601 *et seq.*, (Ley 54) reconoce como política pública que la violencia doméstica es uno de los problemas más graves y complejos que confronta nuestra sociedad. Art. 1.2 de la Ley 54, 8 LPRA sec. 601. El estatuto repudia de manera enérgica esta conducta por ser contraria a los valores de paz, dignidad y respeto que este pueblo quiere mantener para los individuos, las familias y la comunidad en general. *Id.*

En lo que nos atañe, el Artículo 3.3 de la Ley 54, 8 LPRA sec. 633, *Maltrato mediante amenaza*, establece lo siguiente:

> **Toda persona que amenazare con causarle daño a** su cónyuge, ex cónyuge, **a la persona** con quien cohabita o con quien haya cohabitado o **con quien sostiene o haya sostenido una relación consensual**, o la persona con quien haya procreado un hijo o hija, independientemente del sexo, estado civil, orientación sexual, identidad de género o estatus migratorio de cualquiera de las personas involucradas en la relación, a los bienes apreciados por ésta, excepto aquéllos que pertenecen privativamente al ofensor, o a la persona de otro, **incurrirá en delito grave** de cuarto grado en su mitad superior. El tribunal podrá imponer la pena de restitución, además de la pena de reclusión establecida. La amenaza también ocurrirá cuando se utilice cualquier tipo de comunicación electrónica o digital, mediante mensajes de texto, correo de voz, correos electrónicos o redes sociales, o cualquier medio digital. (Énfasis nuestro).

En cuanto a la sanción penal del delito, el inciso (d) del Artículo 16 del derogado Código Penal de 2004, 33 LPRA ant. sec. 4644(d), establecía una pena de reclusión fluctuante entre seis (6) meses un día y tres (3) años (d), para los delitos graves de cuarto grado.

**C.**

Por último, el Artículo 6.06 de la Ley de Armas de 2020, 25 LPRA sec. 466e, *Portación y uso de armas blancas*, dispone:

> **Toda persona que sin motivo justificado** use contra otra persona, o la **muestre**, **o use en la comisión de un delito** o su tentativa, manoplas, blackjacks, cachiporras, estrellas de ninja, cuchillo, puñal, daga, espada, honda, bastón de estoque, arpón, faca, estilete, punzón, martillos, bates, cuartón, escudo, hojas de navajas de afeitar de seguridad, garrotes, agujas hipodérmicas, jeringuillas con agujas o **cualquier instrumento similar que se considere como un arma blanca**, incurrirá en delito grave y convicta que fuere, será sancionada con pena de reclusión por un término fijo de tres (3) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de seis (6) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de seis (6) meses y un (1) día. Las penas que aquí se establecen serán sin derecho a sentencia suspendida, o a disfrutar de los beneficios de algún programa de desvío, o a cualquier alternativa a la reclusión, reconocidas en esta jurisdicción.
> Queda excluida de la aplicación de este Artículo, toda persona que posea, porte o conduzca cualquiera de las armas aquí dispuestas en ocasión de su uso como instrumentos propios de un arte, deporte, profesión, ocupación, oficio o por condición de salud, incapacidad o indefensión. (Énfasis nuestro).

El término *portación* significa "la posesión inmediata o la tenencia física […] sobre la persona del portador o a su alcance inmediato. Por *alcance inmediato* se entenderá al alcance de su mano y la transportación de las mismas". (Bastardillas suplidas). Art. 1.02 de la Ley de Armas, 25 LPRA sec. 461a(gg).

**III.**

En el primer señalamiento de error, el señor Marty Cruz alega que el TPI incidió al emitir un fallo de culpabilidad por los delitos imputados porque el testimonio de la señora Padua Guzmán fue contradictorio, inverosímil y no se corroboró. En el segundo señalamiento de error, el apelante sostiene que el TPI erró al declararlo culpable, aun cuando la prueba del Ministerio Público no estableció todos los elementos de los delitos imputados ni derrotó su presunción de inocencia.

Al argumentar sobre dichos señalamientos de forma conjunta, el apelante plantea que el testimonio de la señora Padua Guzmán fue uno estereotipado porque ésta alegó que su relación con el apelante había culminado en septiembre de 2023, para luego reconocer que, a la fecha de los hechos, continuaban relacionándose. Indica, además, que del testimonio de la perjudicada no se desprende el uso de la cuchilla en la comisión del delito de amenaza, sino sobre una cartera, conducta que el Ministerio Público no procesó. Afirma también que la señora Padua Guzmán no temió por su seguridad porque no llamó a las autoridades y continuó enviándole al apelante mensajes ofensivos. Añade que la testigo llevó a cabo acciones incompatibles al recibo de una amenaza, como por ejemplo: se acostó a dormir y al día siguiente visitó a una manicurista, dejó sola en la casa con la puerta abierta a su hija adolescente, entró a su residencia después de percatarse que el vehículo del apelante estaba estacionado en los predios. Por último, arguye que la señora Padua Guzmán acudió a la Policía cuando el apelante le manifestó que iría a las autoridades migratorias por el esposo de la perjudicada.

Al igual que el apelante, por su relación intrínseca, atendemos unitariamente ambos señalamientos de error.

En esencia, el señor Marty Cruz apoya sus contenciones sobre la insuficiencia de la prueba, en alusión a los testimonios vertidos en el juicio. Por un lado, descarta las declaraciones de la agente Álvarez Rodríguez porque ésta no tenía conocimiento personal de los hechos. De otra parte, indicó que la señora Padua Guzmán, quien sí tenía personal y propio conocimiento de los hechos, emitió expresiones testimoniales no corroboradas, inverosímiles y contradictorias, por lo que no merecían la credibilidad del juzgador.

Según reseñamos, mediante el testimonio creído de la señora Padua Guzmán, se demostró que ésta y el apelante tuvieron una

relación de pareja durante más de un año. Como se sabe, un elemento fundamental de los dos cargos del delito imputado sobre maltrato mediante amenaza, según tipificado en la Ley 54, establece, entre otras instancias, que el victimario y la víctima hayan sostenido una relación consensual. En general, acerca de esta relación, la perjudicada atestiguó que el apelante observó una conducta acosadora, ya que la perseguía, se le aparecía en todos lados y la llamaba insistentemente. Incluso, la testigo declaró que previamente el señor Marty Cruz, quien *estaba en vicio*, le rompió un teléfono móvil, le explotó un neumático y la amenazó con incendiar el apartamento.

Del mismo modo, surge del testimonio de la señora Padua Guzmán que, el 19 de febrero de 2024, el apelante entró a su apartamento, sin que mediara una autorización para ello, y la amenazó de muerte con una cuchilla. La testigo citó al señor Marty Cruz, quien empuñando la cuchilla, enunció que "con esto mismo es que te voy a matar". Añadió que el apelante hizo caso omiso de su petición para que se fuera; y en su lugar, éste acuchilló la cartera de la perjudicada para luego marcharse. Como puede observarse, el apelante conminó a la señora Padua Guzmán de que la iba a matar con una cuchilla. Con dicho proceder incurrió en el delito de maltrato mediante amenaza y violó también la disposición penal que proscribe la tenencia física y el uso, sin motivo justificado, de un arma blanca en la comisión de un delito.

Asimismo, el apelante incurrió nuevamente en una segunda infracción al delito de maltrato mediante amenaza de muerte el 21 de febrero de 2024. Según narrado por la señora Padua Guzmán, esta vez, el señor Marty Cruz volvió a entrar sin autorización a su apartamento. Allí, la empujó hacia la cama y, mientras bajaba las escaleras de la residencia le dijo: "[N]o te preocupes que con quien yo te vea te voy a matar a ti y a esa persona".

Las declaraciones vertidas por la señora Padua Guzmán en la vista en su fondo guardan consonancia con la versión que ésta le ofreció a la agente Álvarez Rodríguez. La agente investigadora aportó que el señor Marty Cruz confirmó la relación consensual, así como su presencia en la residencia. Con esta admisión, en efecto, se corroboró que, el 21 de febrero de 2024, el apelante se encontraba ilegalmente en la casa de su expareja. Cabe resaltar la naturaleza voluntaria de estas expresiones inculpatorias, toda vez que el apelante fue apercibido de sus derechos. (Véase, Exhibit 1 del Ministerio Público, *Advertencias Miranda para persona sospechosa en custodia*).[43]

En suma, a través de los testimonios vertidos a los que el TPI confirió entera credibilidad, el Ministerio Público demostró —más allá de duda razonable— que los días 19 y 21 de febrero de 2024, el señor Marty Cruz maltrató mediante amenaza de muerte a la señora Padua Guzmán, con quien tuvo una relación de pareja. Durante la comisión del delito de maltrato mediante amenaza, en particular el día 19, el apelante portó y usó de manera ilegal una cuchilla pequeña y plateada, considerada un arma blanca, por lo que violó la disposición penal de portación y uso ilegal de un arma blanca.

Ciertamente, contrario a lo alegado, los testimonios de la señora Padua Guzmán y de la agente Álvarez Rodríguez son prueba suficiente en Derecho para establecer y probar sin ambages los hechos delictivos. Como se sabe, los testimonios no tienen que ser perfectos. Inclusive, el Tribunal Supremo ha pautado que no procede rechazar toda la declaración de un testigo porque se haya contradicho o faltado a la verdad respecto a uno o más particulares. *Pueblo v. Chévere Heredia*, 139 DPR 1, 15-16 (1995); refrendado en *Pueblo v. Resto Laureano*, 206 DPR 963, 1003 (2021). En ese

---

[43] Autos ISCR202400329, pág. 71 (sobre).

sentido, "es imprescindible armonizar toda la prueba y analizarla en conjunto a los fines de arribar al peso que ha de concedérsele a la prueba en su totalidad". *Pueblo v. Rodríguez Román*, 128 DPR 121, 129 (1991). Recuérdese que, de conformidad con la Regla 110 de Evidencia, 32 LPRA Ap. VI, R. 110 (d), "[l]a evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley".

Así, pues, los hechos probados de este caso establecen que el señor Marty Cruz, sin autorización, el 19 y 21 de febrero de 2024, penetró en la residencia de su expareja consensual y la maltrató mediante amenaza de muerte. En la primera ocasión, además, sin razón justificante, portó una cuchilla que usó en la comisión del delito de amenaza. Su presencia en el lugar de los hechos fue admitida por el propio apelante, luego de ser debidamente advertido de los derechos que lo cobijaban y renunciar a éstos de manera voluntaria e inteligente. Decididamente, el apelante no logró rebatir la confiabilidad de la adjudicación de credibilidad ni la corrección de los dictámenes condenatorios. En consecuencia, procede confirmar las *Sentencias* apeladas.

**IV.**

Por los fundamentos expuestos, confirmamos las *Sentencias* apeladas, en los casos ISCR202400329, ISCR202400330 y ISCR202400331.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones